IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 1:14-cr-234-WSD |
| JOSE VEGA-CERVANTES and GODELVO PINEDA-ALVAREZ, | |
| Defendants. | |

## OPINION AND ORDER

This matter is before the Court on Jose Vega-Cervantes's ("Cervantes") and

Godelvo Pineda-Alvarez's ("Alvarez") (together, "Defendants") Objections [98, 99]

to Magistrate Judge Janet F. King's Report and Recommendation ("R&R") [93].

The Magistrate Judge recommends that Defendants' Motions to Suppress Evidence

[35, 37, 57, 60], and Motions to Suppress Statements [36, 55], be denied.[1]

## I.   BACKGROUND

On June 24, 2014, a federal grand jury returned an indictment [17] charging

Alvarez and Cervantes with conspiring to possess, with the intent to distribute, at

least 500 grams of a mixture and substance containing a detectable amount of

---

[1]   The Magistrate Judge granted Alvarez's Motion to Adopt [89] the arguments
asserted in Cervantes's Motion to Suppress Evidence [37].

methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), and (b)(1)(C) (Count One); and aiding and abetting the possession, with the intent to distribute, of at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2 (Count Two).  The charges arise from the May 28 and 29, 2014, investigation and controlled delivery of approximately fifteen (15) gallons of liquid methamphetamine found in the fuel tank of a 1982 Chevrolet Scottsdale Pickup Truck (the "Scottsdale Truck") driven by Brenda Pamela-Guerrero ("Guerrero") and delivered to Defendants in Atlanta, Georgia.[2]

In his Motion to Suppress Statements [55], Alvarez argues that his May 29, 2014, statement to law enforcement officers regarding the password to his BLU model Studio 5.5 cellular telephone ("BLU Cell Phone"), was obtained in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).

Although Cervantes also filed a Motion to Suppress Statements [36], Cervantes did not present any evidence or argument, including in his post-hearing brief, in support of his motion.

---

[2]    Guerrero is also charged as a co-defendant in Count One of the Indictment. On November 10, 2014, Guerrero pleaded guilty to Count One.

In their Motions to Suppress Evidence and their post-hearing briefs, Defendants seek suppression of the liquid methamphetamine that was found in the Scottsdale Truck, and all items allegedly seized from their persons, including a BlackBerry Model Curve cellular telephone seized from Cervantes ("Cervantes's BlackBerry"), and the BLU Cell Phone and another BlackBerry Model Curve cellular telephone seized from Alvarez ("Alvarez's BlackBerry")[3] (together, "Alvarez's Cell Phones") (collectively, "Defendants' Cell Phones").[4]

Defendants argue that the Government failed to establish: (1) that the warrantless seizure and search of the Scottsdale Truck was lawful and within the automobile exception to the warrant, and (2) that Defendants' Cell Phones were seized pursuant to an exception to the warrant requirement.  Alvarez argues also that: (i) the Government failed to establish probable cause to support his arrest on May 29, 2014; (ii) the seizure of any evidence resulting from his unlawful arrest, including his BlackBerry and the BLU Cell Phone, are fruits of that unlawful arrest; and (iii) any evidence obtained from the search of his BlackBerry pursuant to a search warrant, issued on July 29, 2014, is required to be suppressed because:

---

[3]     Cervantes's BlackBerry is the same make and model as Alvarez's BlackBerry.  (See Tr. at 73:10-12).

[4]     To the extent Cervantes moved to suppress any evidence found in the Chevrolet Equinox Defendants drove, the Government represented that it does not intend to introduce at trial anything found in the Equinox.  (Tr. at 4).

(a) it is fruit of the initial, unlawful warrantless search of his BlackBerry; (b) the affidavit supporting the warrant application contained materially false information, requiring an evidentiary hearing, under Franks v. Delaware, 438 U.S. 154 (1978); and (c) the search of the BlackBerry exceeded the scope of the search authorized by the search warrant.

On October 27, 2014, November 25, 2014, and January 8, 2015, Magistrate Judge Janet F. King conducted an evidentiary hearing on Defendants' Motions. Testimony was presented from Special Agent Lucas Yates ("SA Yates") of United States Immigration and Customs Enforcement ("ICE"), Special Agent Martin Kautz ("SA Kautz") of the ICE Homeland Security Investigations Unit ("HSI"), Lieutenant Eric Arroyo ("Lt. Arroyo") of the Clayton County Police Department, and Task Force Officers Brian Hoopingarner ("TFO Hoopingarner")[5] and Todd Bailey ("TFO Bailey") of the Department of Homeland Security ("DHS"). Testimony was also presented from Alejandro Cardoco ("Alex") an employee of One Stop Auto Care ("One Stop").[6]  Following the evidentiary hearings, the parties filed their post-hearing briefs [82, 83, 87].

---

[5]    Hoopingarner sometimes is misspelled "Hoopengarner" in the transcript.

[6]    Testimony was also presented from Officer Thomas Soukup of the Atlanta Police Department, Special Agent Daman Grimwade of the Georgia Department of

On April 17, 2015, Magistrate Judge King issued her R&R.  In view of the Government's representation that it will not introduce at trial any evidence obtained using Alvarez's statement to law enforcement officers regarding the password to his BLU Cell Phone, the Magistrate Judge recommended that Alvarez's Motion to Suppress Statement [55] be denied as moot.[7]  The Magistrate Judge found that Cervantes abandoned his Motion to Suppress Statements [36] because, in his post-hearing brief, he did not present any argument in support of that motion, and the Magistrate Judge recommended that it be denied.[8]

The Magistrate Judge also found that evidence obtained from the Scottsdale Truck and Defendants' Cell Phones are not required to be suppressed because:

> (1) Defendants cannot challenge the search and seizure of the Scottsdale Truck because they do not have an expectation of privacy in the Scottsdale Truck and, even if they did, the automobile exception justifies the warrantless search;

> (2) Alvarez's arrest was supported by probable cause, and Alvarez's Cell Phones are not required to be suppressed as fruits of an unlawful arrest;

---

Revenue, Special Agents Christopher Wright and Bryan Haley of HSI, and Alberto Cagetono, another employee of One Stop.

[7]   Because the Government also states that "[i]f there is a way to search the [BLU Cell Phone] without using the password, the Government reserves the right to obtain a search warrant and do so," the Court still considers whether the BLU Cell Phone was lawfully seized incident to Alvarez's arrest.  (See [59] at 4 n.3).

[8]   The Magistrate Judge also found that Cervantes knowingly and voluntarily waived his <u>Miranda</u> rights on May 29, 2014, and that his statement is admissible.

(3) based on the totality of the circumstances, the Government demonstrated by a preponderance of the evidence that Defendants' Cell Phones were seized from their persons incident to their arrests;

(4) removal of the battery from Alvarez's BlackBerry, before obtaining a warrant, did not constitute an unlawful "search" and, even if it did, no information obtained from that search was used to establish probable cause for the search warrant;

(5) a Franks hearing is not necessary because no misleading or false statement was made in the Affidavit supporting the search warrant, and even without the allegedly false statement, probable cause existed to support issuance of the warrant; and

(6) the search of Alvarez's BlackBerry did not exceed the scope of the search authorized by the warrant.

The Magistrate Judge recommended that Defendants' Motions to Suppress

Evidence [35, 37, 57, 60] be denied.

Defendants timely filed Objections [98, 99] to the R&R.[9]

---

[9]     The facts and procedural history are more thoroughly set out in the R&R. The Court in this Order summarizes the relevant background information.  To the extent Alvarez objects to the Magistrate Judge's summary of the facts in the R&R, he does not argue that the Magistrate Judge misstated *material* facts.  Rather, Alvarez asserts that the Magistrate Judge overstated that a "*number* of agents and TFOs present believed that [certain cellular telephones] were seized from Defendant Alvarez's person," when the facts are, Alvarez argues, that only one agent indicated an understanding that the phones were taken from Alvarez's person and that agent was not present when Alvarez was arrested.  To the extent Alvarez claims that the Magistrate Judge incorrectly summarized the sequence of events when Defendants arrived at One Stop, the Court notes that the footnote to the objected-to summary in the R&R contains a more detailed description, which is nearly identical to the sequence of events Alvarez describes in his objection.

## II.   FACTS

On May 28, 2014, around 8:00 a.m., law enforcement officers in Mississippi initiated a traffic stop of the Scottsdale Truck.  (Tr. at 9-12, 32-33, 204).  The Scottsdale Truck was driven by Guerrero and registered in her name.  The Scottsdale Truck was a "very old truck . . . [n]ot in very good shape, not very road worthy" and "would not even maintain speed limit conditions on the interstate." (Tr. at 10:6-10).  Guerrero had obtained the Scottsdale Truck in Abilene, Texas, for the purpose of delivering it to Birmingham, Alabama, in exchange for $1,000.  (Tr. at 31, 39).  Guerrero consented to a search of the Scottsdale Truck, and law enforcement officers discovered approximately fifteen (15) gallons of liquid methamphetamine in the right (passenger side) fuel tank.  (Tr. at 9, 47-50, 203-05).[10]

Guerrero agreed to cooperate with Mississippi law enforcement agents to perform a controlled delivery of the liquid methamphetamine.  (Tr. at 9-10, 13, 33-34, 205).[11]  Because the Scottsdale Truck had mechanical problems, law

---

Having conducted a *de novo* review of the testimony presented at the evidentiary hearing, the Court finds that the Magistrate Judge correctly determined the material facts of this case, and Alvarez's objection is overruled.

[10]     The Scottsdale Truck has two (2) fuel tanks, one on the left (driver) side and one on the right (passenger) side.  (Tr. at 9-10, 47-48, 205).

[11]     A "controlled delivery" allows law enforcement officers to control "the

enforcement officers loaded it onto a flatbed trailer and towed it to Birmingham. (Tr. at 51, 205).  Guerrero accompanied the trailer and the Scottsdale Truck.

Guerrero told law enforcement officers that she had been exchanging telephone calls and text messages about the delivery of the Scottsdale Truck with "Carlos in Mexico," "the man from TJ" (Tijuana), and the person to whom she was supposed to make the delivery, whom she knew as "Flaco."  (Tr. at 11-12, 45, 52-53, 205-09).  Flaco was later identified as Cervantes.  (Id.).  Guerrero and Flaco discussed her location, the mechanical problems with the Scottsdale Truck and the delivery location.[12]  (Id.).  Flaco instructed Guerrero to deliver the Scottsdale Truck to a Travelodge Motel (the "Travelodge") located at 6025 Old Dixie Road, Forrest Park, Georgia.  (Tr. at 11-12, 51-53, 205-207).

DHS Agents and Task Force Officers met the Mississippi officers and Guerrero at the Alabama-Georgia state line and assumed control of the Scottsdale Truck.  (Tr. at 203, 240).  Guerrero remained in communication with Flaco and the two men in Mexico about her location and approximate arrival time.  (Tr. at 52,

---

overall movement and flow of everything that transpires."  (Tr. at 11).  Law enforcement officers took possession of the Scottsdale Truck and retained possession of it throughout the delivery process.  The Scottsdale Truck was always within sight of the officers who were present during and after the controlled delivery.  (Tr. at 239-40).

[12]    Guerrero told Cervantes "it was imperative to get the vehicle delivered because it was overheating and leaking liquid from the right side."  (Tr. at 12).

205-07).  After they arrived in Atlanta, the agents and TFOs participating in the

controlled delivery (collectively, the "Delivery Officers") met at a staging location

near the Travelodge.  The Delivery Officers unloaded the Scottsdale Truck from

the trailer, jump-started it, and instructed Guerrero to drive the Truck to the

Travelodge while they conducted surveillance.  (Tr. at 40-41, 206-09, 266).

Around 3:00 p.m., Guerrero arrived at the Travelodge.  (Tr. at 211).  She

contacted Flaco and the men in Mexico and told them that she had arrived.  (Tr. at

52-54, 209).  Flaco and Guerrero discussed how much money she expected to be

paid and he asked her to take the Scottsdale Truck to a different location.  (Tr. at

209).  The Delivery Officers instructed Guerrero to refuse to drive to the new

location.  (Id.).  Guerrero told the men in Mexico that she did not want to go

anywhere else and that she wanted to receive her payment, get a hotel room, and

rest before her flight home the next day.  (Tr. at 209-210).  Shortly thereafter,

Defendants arrived at the Travelodge in a silver Chevrolet Equinox (the

"Equinox"), driven by Cervantes.  (Tr. at 56-59, 211-213).  Alvarez was in the

passenger seat.  (Id.).

The Equinox parked several spaces away from the Scottsdale Truck.  (Tr. at

56-57, 211).  Defendants did not get out of the Equinox.  After a few minutes, they

left the Travelodge, drove across the street to a restaurant and then to an apartment

9

complex.  (Tr. at 57-59, 211).[13]  Guerrero remained in the Scottsdale Truck at the Travelodge.  She called Carlos in Mexico and told him that she thought Flaco had arrived but left.  (Tr. at 58, 212).  She asked Carlos to have Flaco return to pick up the Scottsdale Truck because she was unsure of what to do with it and was concerned about its mechanical problems.  (Id.).[14]

About twenty (20) minutes after they had left, Defendants returned to the Travelodge in the Equinox and parked next to Guerrero.  (Tr. at 58-59, 211).  Cervantes and Alvarez got out of the Equinox, approached the Scottsdale Truck, and made contact with Guerrero.  (Tr. at 212-13).  Cervantes told Guerrero to place the keys on the floor of the Truck.  (Tr. at 60, 71-72, 271-72).  Guerrero accepted from Alvarez a $1,000 payment for the delivery, and she left to get a motel room.[15]

---

[13]     Based on their training and experience, Delivery Officers believed that Defendants were conducting a "heat check," and were looking for any suspicious vehicles or individuals that might indicate that the Travelodge or the Scottsdale Truck were under surveillance.  (Tr. at 15-16, 216-17).  Delivery Officers observed Cervantes and Alvarez talking on their cell phones while in the Equinox.  (Tr. at 14, 58).

[14]     Based on Guerrero's conversations with Flaco and Carlos, and having observed Defendants talking on cell phones during this time, the Delivery Officers believed that Flaco was speaking directly with Carlos in Mexico to coordinate the delivery.  (Tr. at 23-25, 210).

[15]     TFO Bailey testified that he and the other Delivery Officers first thought that Cervantes had paid Guerrero, but after Defendants were arrested, they learned that Guerrero identified Alvarez as the person who had paid her.  (Tr. at 214; see also Tr. at 79-80).  After Defendants were arrested, Guerrero was asked to identify a

(Tr. at 70-71, 79, 215).  Cervantes got into the Scottsdale Truck and tried unsuccessfully to start it.  (Tr. at 215, 271-72).

Defendants left the Travelodge in the Equinox and drove to a gas station across the street.  (Tr. at 15, 216, 272-73).  A short time later, Defendants returned to the Travelodge in the Equinox and, about five (5) minutes later, a flatbed truck arrived.  (Tr. at 15, 60, 216-17, 273).  Cervantes and Alvarez pushed the Scottsdale Truck from its parking space to help load it onto the flatbed.  (Tr. at 76-78, 216-17, 273).  After the Scottsdale Truck was loaded, the flatbed left the Travelodge.  Defendants followed in the Equinox.  Delivery Officers followed the flatbed truck and the Equinox.  (Tr. at 216-18, 274, 286-87).

The flatbed truck stopped at One Stop, located at 1194 Tanglewood Road, Jonesboro, Georgia.  (Tr. at 32, 217).[16]  Alex, a mechanic at One Stop, was told in a telephone call he received from a customer he knew as "Chulo," that the Scottsdale Truck was being towed to One Stop because it was leaking.  (Tr. at 156-58, 162, 173, 175-76).  Chulo authorized Alex to repair the Truck.  (Tr. at

_____

photo of the Defendant who paid her and she identified Alvarez.  (Tr. at 79-80, 214, 244, 270).  She also "identified Flaco as being the driver of the car; however, she was paid by the other individual that was in the car."  (Tr. at 214:23-25).  It is undisputed that Cervantes is Flaco.

[16]   One Stop was open for business with multiple vehicles parked in front and on the side of the building, and several individuals inside of the shop.  (Tr. at 289).

162).  Defendants arrived in the Equinox, parked in the front of the shop near the

far-left service bay and got out of the vehicle.  (Tr. at 18, 218).  Alex asked

Alvarez if the Scottsdale Truck "cranked," and Alvarez responded that it would

not.  (Tr. 159-60, 188-89).  Alex directed the flatbed truck down an unpaved access

road to the back of One Stop, where the Scottsdale Truck was unloaded.  (Tr. at 18,

159, 188-90; 218-19).[17]  A few minutes later, Alex used some starter fluid and a

jump box to start the Scottsdale Truck.  (Tr. at 157, 160, 177-78).  He drove it

around to the front of the shop, into the far-left service bay, and raised it on a

hydraulic lift.  (Tr. at 18-21, 145, 288-90).  Delivery Officers observed three (3)

individuals underneath the Scottsdale Truck.  (Tr. at 97, 115-16, 290, 315).  They

appeared to be examining the area of the right fuel tank.  (Id.).[18]

   To maintain control over the liquid methamphetamine, Delivery Officers

entered One Stop and secured the Scottsdale Truck and the individuals inside the

shop.  (Tr. 21-22, 29, 223-24).[19]  SA Kautz, TFO Hoopingarner and other Delivery

---

[17]   Alex testified that Cervantes helped him unload the Scottsdale Truck from
the flatbed truck.

[18]   Alex testified that while the Scottsdale Truck was on the lift, Chulo arrived
with two other men, one of whom he identified as "Junior."  Alex stated that he,
Chulo and Junior examined the truck, that he explained what needed to be done to
repair the leak, and that Chulo instructed him to perform the service.  (Tr. at 157,
160-62, 173, 176, 178, 191-92).

[19]   SA Kautz testified that, once the Scottsdale Truck was on the lift, Delivery

Officers, entered through the open bay doors in the front of the shop.  Other

Delivery Officers drove to the back of One Stop.  (Tr. 291-93).  SA Kautz and

TFO Hoopingarner saw a few individuals inside the shop and others run toward the

back of the shop.  (Tr. at 97, 224).  TFO Hoopingarner apprehended Alvarez at the

back of the shop.  (Tr. at 294, 300-01, 315-17).[20]

TFO Bailey was at the back of One Stop during the takedown.  (Tr. at 224).

There he saw a man laying face down, with his back up against the fence and

partially underneath a car.  (Tr. at 225).  The man did not comply with TFO

Bailey's instructions, in English and Spanish, to put up his hands.  (Tr. at 226).

The man was lifted out from under the car, placed on the car hood and handcuffed.

(Tr. at 226-27).  TFO Bailey recognized the man as Cervantes, the driver of the

---

Officers entered One Stop quickly because:

> We said, you know, we're a few seconds from being able to or
> possibly losing the dope, and I said yeah, because if the garage door
> closed how long would it take to close the garage door, and he said a
> couple of seconds, and I said yeah, then at that point somebody could
> be siphoning those into a water bottle or anything else and sticking
> them in their pocket and walking out of the building.

(Tr. at 290:22-291:3; see also Tr. at 312-13).

[20]    SA Kautz testified that "it appeared" that Alvarez "was inside trying to get
out and maybe went a little bit out but came back in or Hoopengarner brought him
back in" and that Alvarez "was located . . . a few feet outside that bay door or just
at that bay door."  (Tr. at 315-316).  When pressed, SA Kautz testified that "he saw
Hoopengarner moving towards" Alvarez, but he was "not clear . . . whether
[Alvarez] was also moving or attempting to leave the shop."  (Tr. at 316-17).

Equinox.  (Tr. at 227).  Cervantes was walked to the shop and seated in the shop.

(Tr. 228).  TFO Bailey asked Cervantes if he had the keys to the Equinox.  He

indicated that he did, and TFO Bailey retrieved the keys from Cervantes's pocket.

(Tr. at 228).[21]

When TFO Bailey asked to interview Alvarez, he invoked his Miranda

rights.  (Tr. at 237).  TFO Bailey saw a BlackBerry and BLU Cell Phone that he

believed belonged to Alvarez.  When asked from where he retrieved Alvarez's Cell

Phones, he testified:

> A.   I don't recall anybody going anyplace to get them, and again, I
> don't remember where his phones were exactly located.
>
> Q.   What do you remember about where the phones that you
> believe were his were found?
>
> A.   Right there where we were interviewing him.
>
> Q.   Do you recall if they were on his person?
>
> A.   I can't, I can't recall whether they came out of his pockets or
> where they were.  I don't recall that.
>
> . . .

---

[21]   All of the individuals detained at One Stop were patted down for weapons.
(Tr. at 257, 302).  The One Stop employees were detained in the shop office,
separate from Defendants and the other individuals who were at One Stop.  (Tr. at
185-86).

A.      When he identified them, they were in his hands, and/or with [Lt.] Arroyo.  They were in front of him, and he indicated which one was which.  Where they were at just prior to that, I can't recall where they came from.

. . .

Q.      Prior to that point, had the phones been taken from him already prior to that point?

A.      I don't know where they were prior to that, so I don't know.

(Tr. at 237, 276-77).  Officer Hoopingarner testified:

Q.      And when [Alvarez] was interviewed, did you find phones on his person?

A.      Yes, sir.

Q.      How many phones did you find?

A.      I don't recall how many.

Q.      You actually conducted a pat down of Mr. Alvarez?

A.      No, Your Honor.  I believe when he had been asked, I knew, having been there, that he had phones on him.  I don't know who took them off of him.

(Tr. at 117:15-24).[22]  SA Yates, the case agent, testified that it was his

understanding that Alvarez's Cell Phones were "taken off of Mr. Alvarez's persons

---

[22]     When TFO Hoopingarner testified that he did not personally seize Alvarez's Cell Phones, the Magistrate Judge struck this testimony.  (Tr. at 117-18).  The Court, like the Magistrate Judge, does not consider the testimony in deciding the pending motions to suppress.  The Court notes that the statement is relevant to the

[sic]," that nothing belonging to Alvarez was seized from the Equinox, and that he "know[s] of nothing that came out of the Equinox."  (Tr. at 64:19-65:1).[23]

Approximately an hour after he was apprehended, Cervantes was interviewed by TFO Bailey and TFO Hoopingarner, with Lt. Arroyo translating. (Tr. at 85-92, 117-120, 229-237).  The interview was conducted inside the shop. (Tr. at 86-89, 91, 230-32, 254-55 & Gov't Ex. 6).  Cervantes executed a form, in Spanish, waiving his Miranda rights.  Cervantes acknowledged that he did not have any questions about the waiver and signed the form.  (Tr. at 121, 234). TFO Bailey asked Cervantes if he had a cell phone.  Cervantes stated that he did. (Tr. at 85, 234).  When asked for the location of the cell phone, TFO Bailey testified:

> A.    I don't know exactly where it was.  I recall he gestured in the direction with his face towards the area where he was seated prior to the interview.
>
> Q.    And when he gestured, what did you and the other officer do?
>
> A.    I did not go with him.  It's my recollection that [Lt.] Arroyo walked over with him and retrieved the cell phone, but I don't recall where they retrieved it from.
>
> Q.    Do you know how the cell phone got to wherever it was sitting?

---

issue of how the Government gained possession of Defendants' Cell Phones.
[23]    SA Yates was present at the Travelodge and One Stop, but he returned to his office at the airport before the takedown occurred.  (Tr. at 36:17-21).

A.    I do not.

Q.    And did he return to that location once he had the phone?

A.    Yes.

Q.    And what did you do – what did you ask him to do with the phone?

A.    Two things.  He provided a phone number for an individual in Mexico.  It had a Mexico prefix to it, and we also asked him if he would call Ms. Guerrero.

(Tr. at 234-35).[24]  At the time they asked Cervantes to call Guerrero, Cervantes's

Blackberry was "behind the toolbox" where one of the agents had placed it after

Cervantes was patted down.  (Tr. at 118:9-10).[25]

Defendants' Cell Phones were brought to the DHS office.  (Tr. at 64).

Before obtaining a warrant to search them, SA Yates removed the batteries from

Defendants' Cell Phones "to view identifying information behind the battery,"

turned them on, and "went into the memory" to identify the serial number and

telephone number associated with each cell phone.  (Tr. at 26-28; 65-68).  SA

---

[24]    Cervantes attempted to call Guerrero, but Guerrero did not answer.  TFO Bailey testified that they wanted Cervantes to call Guerrero "under the assumption that we were going to go back to the hotel and arrest her."  (Tr. at 235).
[25]    A contracting firm was called to One Stop to drain and dispose of the liquid methamphetamine from the Scottsdale Truck.  (Tr. at 22-23, 237).

Yates did not look into any of the call logs, contact lists, or text messages before obtaining a search warrant.  (Tr. at 68-69).[26]

On July 29, 2014, a search warrant was obtained for Defendants' Cell Phones, including Alvarez's BlackBerry.[27]  The warrant application was supported by the Affidavit of Dustin J. Small, a Special Agent with DHS ("SA Small").  (Small Aff. [57.1]).  In his Affidavit, SA Small describes his training and experience, including his training in "the exploitation of telephones and other communication devices as investigative techniques."  (Id. ¶ 6).  SA Small states that he is familiar with how drug traffickers conduct their business and that they "routinely use cellular telephones (cell phones) to conduct and further their illegal activities [and] to communicate with other drug traffickers, co-conspirators, confederates, and the like for the purpose of facilitating their narcotics business

---

[26]     SA Yates testified that TFO Bailey used "one or both of the[] BlackBerrys . . . to dial back to his government phone in an attempt to get the I.D. number, the actual phone number."  (Tr. at 73).  It is not clear whether TFO Bailey was successful in identifying the telephone numbers associated with Defendants' Cell Phones by using this method.

[27]     Search warrants were obtained for the three (3) Cell Phones.  Cervantes does not challenge the search warrant for his Blackberry, and the Government represents that it does not seek to introduce evidence obtained from the BLU Cell Phone.  Accordingly, the Court limits its discussion of the search warrant to the one issued for Alvarez's BlackBerry.  The affidavits in support of the search warrants for Defendants' Cell Phones are identical, and the Court's reasoning in this Order applies even if the search warrants for Cervantes's BlackBerry and Alvarez's BLU Cell Phone were challenged.

[and they] are known to keep these telephones with them while conducting their illegal affairs."  (Id. ¶¶ 8-9).  SA Small describes the May 28 and 29, 2014, investigation, including the traffic stop, Guerrero's communications with Flaco and the individuals in Mexico, the controlled delivery of the Scottsdale Truck containing the liquid methamphetamine, and the events at the Travelodge and One Stop.  SA Small states:

> Agents arrested both CERVANTES and ALVAREZ.  Upon searching CERVANTES, agents found a black/silver BlackBerry Curve 9310.  Upon searching ALVAREZ, agents found a black/silver BlackBerry Curve 9310 and a white and black BLU model Studio 5.5S.  These were the phones used to communicate with the driver and likely used to communicate with others in Mexico regarding the terms of the deal.

(Id. ¶ 23).  He states that identifying information was retrieved from Defendants' Cell Phones, describes the process used, and that the phones were secure since they were seized.  SA Small states further that Defendants were indicted on June 24, 2014, on federal drug trafficking charges.  (Id. ¶¶ 23-26).

The search warrant allowed a search for:

a.  lists of customers and related identifying information;

b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

d.  any information recording schedule or travel;

     e.   all bank records, checks, credit card bills, account information, and other financial records[; and]

     f.   any and all communications with co-conspirators, including but not limited to voice calls, text messages, and pin-to-pin messages[.]

(See [57.1] at 3).  The search warrant noted that "the terms 'records' and 'information' include all of the foregoing items of evidence in whatever form and by whatever means that may have been created or stored, including any form of computer or electronic storage . . . ."  (Id.).

## III.   LEGAL STANDARD

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; Williams v. Wainwright, 681 F.2d 732 (11th Cir. 1982), cert. denied, 459 U.S. 1112 (1983).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party."  Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990) (internal citations omitted).  With respect to those findings and recommendations to which objections have not been asserted, the Court must

conduct a plain error review of the record.  United States v. Slay, 714 F.2d 1093,

1095 (11th Cir. 1983), cert. denied, 464 U.S. 1050 (1984).

Defendants did not object to the Magistrate Judge's recommendations that

their Motions to Suppress Statements be denied.  The Magistrate Judge found that

Cervantes failed to present any evidence in support of his Motion to Suppress

Statements, including in his post-hearing brief, and concluded that Cervantes

abandoned his Motion to Suppress Statements.  The Magistrate Judge also found

that, in view of the Government's representation that it will not introduce at trial

any evidence obtained using Alvarez's statement to law enforcement officers

regarding the password to his BLU Cell Phone, Alvarez's Motion to Suppress

Statements is moot.  The Magistrate Judge recommended that Defendants' Motions

to Suppress Statements be denied, and the Court finds no plain error in these

findings or recommendations.  Defendants' Motions to Suppress Statements are

denied.

The Court conducts a *de novo* review of Defendants' Objections to the

remaining portions of the R&R.

## IV.  DISCUSSION

### A.  <u>Search and Seizure of the Scottsdale Truck</u>[28]

Defendants argue that any evidence obtained from the Scottsdale Truck must be suppressed because the May 29, 2014, seizure, and search, of the Scottsdale Truck was conducted without a warrant in violation of their Fourth Amendment rights.  Defendants object to the Magistrate Judge's conclusion that they lack standing to challenge the search and seizure of the Scottsdale Truck.  Defendants contend that they had a reasonable expectation of privacy in the Scottsdale Truck because Cervantes "borrowed" it from Guerrero, the registered owner, with her permission, and because Alvarez is the person whom Guerrero identified as the person who paid her for delivery of the truck.

Defendants also object to the Magistrate Judge's conclusion that, even if they had standing, the automobile exception justifies the warrantless search and seizure of the Scottsdale Truck.  They argue that, because the Scottsdale Truck was having mechanical problems and was raised on the lift for repair, the Scottsdale Truck was not readily mobile and the automobile exception to the warrant requirement does not apply.  The Court considers first whether Defendants have a

---

[28]     There is no evidence to show that anything other than the liquid methamphetamine was seized from the Scottsdale Truck.

reasonable expectation of privacy to challenge the warrantless search and seizure of the Scottsdale Truck.

      1.    <u>Standing</u>

The Fourth Amendment protects persons from "unreasonable searches and seizures."  U.S. Const. amend. IV.  On a motion to suppress, the movant bears the burden of showing that his Fourth Amendment rights were violated by the search or seizure challenged.  <u>Rakas v. Illinois</u>, 439 U.S. 128, 130 n.1 (1978).  The movant must first prove that he had a "'constitutionally protected reasonable expectation of privacy'" in the place or thing searched.  <u>New York v. Class</u>, 475 U.S. 106, 112 (1986) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 360 (1967)).  A movant may show he had a reasonable expectation of privacy by showing both (1) that he had an actual subjective expectation of privacy in the thing searched or seized, and (2) that his subjective expectation of privacy is one society is prepared to accept as objectively reasonable.  <u>See</u> <u>United States v. Miravalles</u>, 280 F.3d 1328, 1331 (11th Cir. 2002) (citing <u>Katz</u>, 389 U.S. at 361).

Defendants claim that they have a reasonable expectation of privacy in the Scottsdale Truck because Cervantes "borrowed" the Scottsdale Truck from Guerrero, and because Alvarez is the person whom Guerrero later identified as

having paid her for delivery of the truck.  The Court disagrees.

The evidence is that Chulo contacted Alex at One Stop and told him that the Scottsdale Truck was being towed to the shop for service.  (Tr. at 158, 173). Although Defendants and the flatbed truck carrying the Scottsdale Truck arrived at the same time, after Alvarez told Alex that the Scottsdale Truck would not "crank" and Cervantes helped unload it from the flatbed truck, Defendants had no further association with the Scottsdale Truck.  (Tr. at 177).  It was Alex who started the Scottsdale Truck, drove it on the One Stop premises, and put it on the hydraulic lift in a service bay.  All of this was initiated by Alex following his conversation with his customer, Chulo.  After Chulo arrived, he exercised control over the Scottsdale Truck by examining it with Alex and authorizing Alex to perform the necessary repairs.  (Tr. at 162).

The facts do not support that either Defendant maintained possession or control sufficient to support a subjective expectation of privacy in the Scottsdale Truck.  In fact, the facts support that they did not exercise control over the truck at all.  It was in Alex's possession at the time it was seized and he was working on it under the authorization and direction of Chulo.  See, e.g., United States v. Glasgow, 658 F.2d 1036, 1044) (5th Cir. 1981) (defendant who had previously driven vehicle searched, but who was not in possession of vehicle

when it was searched could not establish that "he had property rights, either by lawful possession or by control with the right to exclude, which would indicate that he had a legitimate expectation of privacy" in the vehicle); United States v. Baker, 221 F.3d 438, 443 (3d Cir. 2000) (to support expectation of privacy in a vehicle, although outright ownership is not required, there must be "clear evidence of continuing possession and control, as well as no evidence that the driver obtained the car illegitimately"); see also United States v. Macias-Treviso, 42 F. Supp. 2d 1206, 1213 (D. N.M. 1999) (stating, "[t]he task of repairing a car, or driving a car to a garage to be repaired, is not one in which individuals usually seek privacy").

That Defendants disassociated themselves from the truck by fleeing One Stop during the takedown, further supports that Defendants abandoned any possession and control that they claim to have had over the Scottsdale Truck.  (Tr. 219, 294, 300-01, 315-17).  See, e.g., United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001) ("[A]n individual who abandons or denies ownership of personal property may not contest the constitutionality of its subsequent acquisition by the police."); United States v. Edwards, 441 F.2d 749 (5th Cir. 1971) (defendant abandoned his car, and thus relinquished his Fourth Amendment rights in it, when he left it on public road, with engine running and keys in ignition,

while he fled on foot from police);[29] United States v. Falsey, 566 F. App'x 864

(11th Cir. 2014) (defendant abandoned vehicle when, mistakenly believing he was

being pursued by police, he sped into parking lot, left keys in unlocked vehicle and

ran into woods); United States v. Jefferson, 451 F. App'x 833, 834 (11th Cir. 2001)

("Police pursuit or the existence of a police investigation does not of itself render

abandonment involuntary.") (quoting United States v. Colbert, 474 F.2d 174, 176

(5th Cir. 1973)).[30]

 Even if Defendants had a subjective expectation of privacy in the Scottsdale

Truck—which the Court finds they do not—Defendants fail to show that their

expectation was objectively reasonable. The Government acquired possession of

the Scottsdale Truck in Mississippi and maintained custody and control of it from

---

[29] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Former Fifth Circuit issued before the close of business on September 30, 1981.

[30] To the extent Defendants rely on United States v. Miller, 821 F.2d 546 (11th Cir. 1987) and United States v. Cooper, 133 F.3d 1394 (11th Cir. 1998) to support that they had a reasonable expectation of privacy in the Scottsdale Truck because they borrowed it from Guerrero, in those cases, the driver had possession and control of the borrowed vehicle at the time it was seized. Here, Defendants were not in possession or control of the Scottsdale Truck when the seizure occurred. See United States v. Gibson, 708 F.3d 1256 (11th Cir. 2013) (where defendant had no possessory interest in vehicle and did not have exclusive custody or control of vehicle, his reasonable expectation of privacy extended only to those times when vehicle was in his possession). The vehicle which Defendants possessed and controlled was the Equinox, not the Scottsdale Truck.

that point forward.  The Scottsdale Truck was searched pursuant to Guerrero's consent, and the liquid methamphetamine in the Truck was discovered during the search in Mississippi.[31]  It is well-established that "'[n]o protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal.' . . . In the absence of a 'substantial likelihood' that the contents have been changed while out of the sight of the surveillance officer, an individual's expectation of privacy is not restored or revived."  United States v. Quintero, 848 F.2d 154, 155 (11th Cir. 1988) (quoting Illinois v. Andreas, 463 U.S. 765, 771 (1983)).[32]

The Court concludes that Defendants did not have a legitimate expectation of privacy in the Scottsdale Truck or the liquid methamphetamine in it.  Defendants' objections to the warrantless search and seizure of the Scottsdale Truck and its contents are overruled.

---

[31]    After Guerrero gave the Scottsdale Truck to Defendants, law enforcement maintained surveillance and control over the truck and its illegal contents.

[32]    If Alvarez argues that his expectation of privacy was objectively reasonable because he did not know the Scottsdale Truck contained liquid methamphetamine, the Supreme Court has held that "the mere fact that the consignee takes possession of the container would not alone establish guilt of illegal possession . . . of contraband.  The recipient of the package would be free to offer evidence that the nature of the contents were unknown to him; the nature of the contents and the recipient's awareness of them would be issues for the fact-finder."  Andreas, 463 U.S. at 769 n.3.

2.     Automobile Exception

The "automobile exception" allows law enforcement officers to "conduct a warrantless search of a vehicle if: (1) the vehicle is readily mobile (i.e., operational); and (2) officers have probable cause to believe the vehicle contains contraband or evidence of a crime."  United States v. Adigun, 567 F. App'x 708, 712 (11th Cir. 2014) (quoting United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006); see also Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)).  The Fourth Amendment does not require exigent circumstances beyond the fact that a vehicle is functional and readily mobile.  See, e.g., United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003).  "[A]lthough ready mobility was perhaps the original justification for the vehicle exception . . . [it] is not the only basis for the exception. . . . 'Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.'"  California v. Carney, 471 U.S. 386, 391 (1985) (quoting South Dakota v. Opperman, 428 U.S. 364, 367 (1976)).

Defendants contend that the automobile exception does not apply because the Scottsdale Truck was not readily mobile because of its mechanical problems

and because it was elevated on the lift.[33]  The Supreme Court, in

Michigan v. Thomas, 458 U.S. 259 (1982), stated:

> It is . . . clear that the justification to conduct . . . a warrantless search
> [of an automobile] does not vanish once the car has been immobilized;
> nor does it depend upon a reviewing court's assessment of the
> likelihood in each particular case that the car would have been driven
> away, or that its contents would have been tampered with, during the
> period required for the police to obtain a warrant.

458 U.S. at 261.  The Eleventh Circuit has consistently held that "[t]he mobility

requirement focuses on whether the vehicle is capable of functioning, not whether

it is likely to move in the near future."  United States v. Garcia, 433 F. App'x 741,

744-45 (11th Cir. 2011) (citing Thomas, 458 U.S. at 261); see also Tamari,

454 F.3d at 1261 (indicating that "readily mobile" means "operational").

Here, the Scottsdale Truck, although in need of repair, was readily mobile at

the time it was seized.  The evidence is that earlier in the day, Guerrero drove the

Scottsdale Truck from the staging location to the Travelodge.  (Tr. at 40-41,

206-09).  Minutes before the takedown at One Stop occurred, Alex jump started

the Truck with just a battery pack and some starter fluid, and then drove it around

the front of the shop and into the service bay.  (Tr. at 18, 157-60, 288-89).  That the

---

[33]    Defendants acknowledge that Delivery Officers had probable cause to
believe that the Scottsdale Truck contained liquid methamphetamine.  This prong
of the automobile exception is not at issue.

Scottsdale Truck had to be jump-started or was in need of repairs does not impact its inherent mobility or support that it is no longer capable of functioning.  The facts here are that the Truck actually was mobile.  See Thomas, 458 U.S. at 261; Carney, 471 U.S. at 391 ("Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception."); United States v. Mercado, 307 F.3d 1226, 1229 (10th Cir. 2002) (defendant's vehicle, which was in an auto repair shop for mechanical problems, "had not lost its inherent mobility;" "mere temporary immobility due to a readily repairable problem while at an open public repair shop does not remove the vehicle from the category of 'readily mobile'"); United States v. Rommann, 902 F.2d 1570 (6th Cir. 1990) (vehicle up on a jack with one wheel removed for repair of flat tire still "readily mobile"); United States v. Fields, 456 F.3d 519, 513 (5th Cir. 2006) (applying automobile exception after car had crashed into a wall).  The Court concludes that the Scottsdale Truck was readily mobile and probable cause existed to believe that it contained contraband.  A warrant was not required to seize the Scottsdale Truck and evidence obtained from the warrantless search and seizure of the Scottsdale

Truck is not required to be suppressed.  Defendants' objection based on the ground that automobile exception does not apply, is overruled.[34]

B.   Alvarez's May 29, 2014, Arrest

Alvarez objects to the Magistrate Judge's finding that his arrest was supported by probable cause.  Alvarez argues that there is not any evidence to support that he knew there was liquid methamphetamine in the Scottsdale Truck. Alvarez claims he was merely present with Cervantes when Cervantes "took possession of the truck from Ms. Guerrero and arranged for its transport to the One Stop Auto Shop."  (Obj. [99] at 4).  Alvarez seeks to suppress all evidence that was seized incident to his arrest at One Stop, specifically his BlackBerry.  He also moves to suppress any statements he made to law enforcement, and any evidence seized on the grounds the statement and evidence were the fruits of an arrest without probable cause.

"Law enforcement officers have probable cause to arrest when the facts and circumstances within their collective knowledge, 'or of which they have

---

[34]   The Court notes that, even if the automobile exception did not apply, the initial search and seizure of the Scottsdale Truck occurred in Mississippi pursuant to Guerrero's consent, and it is well-established that "once a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost. Consequently, the subsequent reopening of the container is not a 'search' within the intendment of the Fourth Amendment."  Andreas, 463 U.S. at 771-72.

reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense.'" United States v. Wall, 343 F. App'x 564, 567 (11th Cir. 2009) (quoting Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) (en banc)). "[P]robable cause . . . is a doctrine of reasonable probability and not certainty." United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995).

Whether probable cause exists is evaluated based on the "totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 233 (1983). A court may consider the involved officers' experience, because "[c]onduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer." United States v. Gonzalez, 969 F.2d 999, 1003-04 (11th Cir. 1992). "[P]robable cause . . . can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest, when there is some degree of communication between the two." United States v. Nieto, 510 F.2d 1118, 1120 (5th Cir. 1975), cert. denied, 423 U.S. 854 (quotation and citation omitted); see also United States v. Allison, 953 F.2d 1346, 1350 (11th Cir. 1992) ("Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause.") (citation omitted).

The totality of the circumstances here reasonably led officers to believe that Alvarez had engaged in criminal conduct, including that he was involved in a conspiracy to possess with the intent to distribute fifteen (15) gallons of liquid methamphetamine, a controlled substance.  When Alvarez was arrested, the Delivery Officers knew that Guerrero was delivering to Atlanta a large quantity of liquid methamphetamine concealed in one of the fuel tanks of the Scottsdale Truck.  Guerrero had been in contact with "Flaco," the person to whom she was supposed to deliver the methamphetamine, who told her to deliver the Truck and its contents to the Travelodge.  After she told Flaco (later identified as Defendant Cervantes) and her contact in Mexico that she had arrived at the Travelodge, Cervantes and Alvarez arrived at the Travelodge together in the Equinox.  (Tr. at 53-56, 210-12).

After a few minutes, Defendants left the Travelodge in the Equinox, drove to a restaurant, waited a few minutes, drove to an apartment complex, waited a few minutes, and then returned to the Travelodge and parked near Guerrero and the Scottsdale Truck.  (Tr. at 57-59, 212-13, 272).  Delivery Officers testified, based on their training and experience, that it appeared that Defendants were conducting a "heat check"—that is, looking for suspicious vehicles or individuals that might indicate that the Travelodge or the Scottsdale Truck were under surveillance.  (Tr.

33

at 15-16, 216-17).  At the Travelodge, Alvarez and Cervantes got out of the Equinox, together, approached the Scottsdale Truck and made contact with Guerrero.  One of the Defendants paid Guerrero.  Cervantes then entered the Scottsdale Truck after Guerrero left the Travelodge.  (Tr. at 59-60, 271-72).

When the Scottsdale Truck did not start, Alvarez and Cervantes left the Travelodge in the Equinox and drove across the street to a gas station.  (Id.).  A few minutes later, the Equinox returned to the Travelodge, a flatbed truck arrived, and Alvarez and Cervantes pushed the Scottsdale Truck out of the parking space to load it onto the flatbed truck.  (Tr. at 15, 76-78, 216-17, 273).  The Scottsdale Truck was towed to One Stop.  Defendants followed the flatbed truck in the Equinox.

Once Defendants got out of the Equinox, they entered the One Stop shop.  The flatbed truck drove to the back of One Stop, where the Scottsdale Truck was unloaded, jump-started and then driven around to the front of the shop, into one of the service bays, where it was raised on a lift.  (Tr. at 18, 159-60, 188-89, 218).  The Delivery Officers then observed three (3) individuals underneath the Scottsdale Truck, examining the area of the right fuel tank.  The Delivery Officers decided to enter One Stop to secure the Scottsdale Truck containing the methamphetamine and to detain the individuals inside the shop.  (Tr. at 97, 115-16,

34

290, 315).  Alvarez, one of the individuals in the shop, attempted to leave out of the back of the shop, where he was apprehended.  (Tr. at 294, 300-301, 315-17).

These facts support a reasonable belief that Alvarez and Cervantes were both involved in the delivery to and acceptance in Atlanta of the liquid methamphetamine in the Scottsdale Truck.  The Court agrees with the Magistrate Judge that, given the poor condition and age of the Scottsdale Truck, "it is doubtful that [Alvarez's] presence is accounted for based on a belief that his associate went through all of the effort expended on May 29, 2014, simply to take possession of a beat-up truck over thirty years old."  (R&R at 33).  The evidence instead supports that the Truck was valuable to Cervantes and Alvarez because of its cargo. Alvarez accompanied Cervantes when the Scottsdale Truck containing fifteen (15) gallons of methamphetamine arrived in Atlanta and Guerrero was paid for its delivery,[35] and he was with Cervantes at each step of the process by which the Scottsdale Truck was delivered to One Stop for repairs.  That Alvarez tried to flee the shop when Delivery Officers entered further supports a reasonable belief that Alvarez was involved in the conspiracy to possess with the intent to distribute the

---

[35]    At the time of his arrest, Delivery Officers knew that Alvarez was with Cervantes at the time Guerrero was paid for the Scottsdale Truck.  That Guerrero later stated it was Alvarez who paid her for the delivery discredits Alvarez's claim that he was merely present.

methamphetamine.  See United States v. Major, 341 F. App'x 549 (11th Cir. 2009)

(finding probable cause to arrest defendant, who argued no evidence tied him to

cocaine and he was merely a passenger in the car, stating "it is probable that

[defendant] was involved with the drug transaction because he was in [the] vehicle

at the precise time and place [his companion] was scheduled to make a significant

cocaine sale, an unlikely situation for an unknowing passenger merely along for

the ride"); United States v. Pantoja-Soto, 739 F.2d 1520, 1524 (11th Cir. 1984)

(where officers had probable cause to believe drugs were being sold at service

station and, as they were approaching, defendant attempted to flee, "given

[defendant's] presence at the station and his flight, officers had probable cause to

believe that he was in some way involved in the drug transaction"); United States

v. Herzbrun, 723 F.2d 773, 778 (11th Cir. 1984) ("in appropriate circumstances,

[flight] can supply the key ingredient justifying the decision of a law enforcement

officer to take action . . . . Flight invites pursuit and colors conduct that might

otherwise appear innocent.").[36]

---

[36]    Although "flight combined with mere presence is insufficient to *prove*
participation in a conspiracy," it is well-settled that "the arresting officer need not
have in hand evidence sufficient to convict."  United States v. Miranda, 425 F.3d
953, 960 (11th Cir. 2005) (citing Pantoja-Soto, 739 F.2d at 1527).  Here, the Court
considers only whether there was a reasonable belief that Alvarez had engaged in
criminal activity.  See Magluta, 44 F.3d at 1535 ("[P]robable cause . . . is a

After *de novo* review, the Court concludes that probable cause existed to arrest Alvarez and his objection based on an absence of probable cause to arrest is overruled.  Having found there was probable cause to arrest Alvarez, the Court concludes that any evidence seized from Alvarez pursuant to his arrest is not required to be suppressed.

C.    Seizure of Defendants' Cell Phones

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution.  The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment."  United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted).  The burden to establish the application of the warrant exception is by a preponderance of the evidence.  See United States v. Matlock, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (citing Lego v. Twomey, 404 U.S. 477, 488-89 (1972)).  "A preponderance of the evidence simply means an amount of evidence that is enough to persuade the Court doctrine of reasonable probability and not certainty.").

that the existence of a fact is more probable than its non-existence." United States v. Latimore, 2014 WL 3109183, at *11 (N.D. Ga. July 7, 2014) (citing Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 137 n.9 (1997)).

"[A] search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." United States v. Robinson, 414 U.S. 218, 224 (1973). The search of an arrestee incident to a lawful arrest "enables officers to safeguard evidence, and, most critically, to ensure their safety during the 'extended exposure which follows the taking of a suspect into custody.'" Virginia v. Moore, 533 U.S. 164, 178 (2008) (quoting Robinson 414 U.S. at 234-35). "A search incident to arrest is always allowed of the suspect's person and the immediate area from which the suspect can grab a weapon or destroy evidence." United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987) (citing Chimel v. California, 395 U.S. 752 (1969)).

A search incident to arrest is not required to occur simultaneously with the arrest, and may be conducted at a later time or another location, so long as the search and seizure is otherwise reasonable. See, e.g., United States v. Edwards, 415 U.S. 800, 803 (1974) ("searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention"); see also United States v. Sonntag, 684 F.2d 781, 786

(11th Cir. 1982); United States v. Baldwin, 644 F.2d 381, 384 (5th Cir. 1981) (citations omitted) (because defendant's arrest was supported by probable cause, "the warrantless search of his person was justified since it was a search incident to his lawful arrest . . . and was not precluded by the passage of a few hours . . . .").[37]

Cervantes does not dispute there was probable cause for his arrest. He and Alvarez instead argue that the Government failed to show that Defendants' Cell Phones were lawfully seized from their persons incident to their arrests.[38] Defendants object to the Magistrate Judge's finding that it is more probable than not that Defendants' Cell Phones were seized from Defendants' persons or from areas within their vicinity.

The record contains sufficient evidence to support that it is more probable than not that Defendants' Cell Phones were seized from Defendants' persons or

---

[37]    To the extent they argue that Defendants' Cell Phones were not seized incident to their arrest because it is unclear when Defendants actually were arrested, it is well-settled that "[w]here the formal arrest follow[s] quickly on the heels of the challenged search of [an arrestee's] person, we do not believe it particularly important that the search preceded the arrest rather than vice versa." Rawlings v. Kentucky, 448 U.S. 98, 111 (1980); see also United States v. Banshee, 91 F.3d 99, 102 (11th Cir. 1996) ("[B]ecause there was probable cause for the arrest before the search and the arrest immediately followed the challenged search, the fact that [defendant] was not under arrest at the time of the search does not render the search incident to arrest doctrine inapplicable.").

[38]    Defendants speculate that their Cell Phones may have been seized from the Equinox.

from areas within their vicinity following their arrests.  There is no evidence in the

record to support that Defendants' Cell Phones were seized from the Equinox, and

it is not clear if the Equinox even was searched.[39]  SA Yates, the case agent,

testified that he "know[s] of nothing that came out of the Equinox."  (Tr. at 64-65).

Although they were unable to recall specifically when, where, or even by whom

Defendants' Cell Phones were seized, TFO Bailey, TFO Hoopingarner, and

---

[39]     The Court notes that, even if Defendants' Cell Phones were seized from the
Equinox after their arrest, it could be reasonable for law enforcement officers to
have believed that evidence related to Defendants' arrest for conspiracy to possess
with the intent to distribute methamphetamine would be found in the Equinox.  See
Arizona v. Gant, 556 U.S. 332 (2009) (law enforcement may search the passenger
compartment of a vehicle incident to a recent occupant's arrest if it is reasonable to
believe that the arrestee might access the vehicle at the time of the search of that
the vehicle contains evidence of the offense of arrest); United States v. Slone, 636
F.3d 845, 851-52 (7th Cir. 2011) ("In this case, it was reasonable to believe that
evidence related to the offense of arrest would be found in the passenger
compartment, because agents had arrested Slone while he was in the process of
conducting security or counter surveillance operations in a drug trafficking
conspiracy.  As the district court observed, officers could have reasonably expected
to find money, cell phones, maps, drawings, or other evidence linking the
occupants of the red Dodge pickup to the crime.  Slone's argument that the district
court erred because the enumerated pieces of possible evidence 'are not
contraband, nor necessarily evidence of any crime,' misperceives the inquiry.  The
offense of arrest was conspiracy—evidence that the parties were engaged in a joint
venture was what officers reasonably would have been seeking.").  The Court
notes again, there is no evidence to support that Defendants' Cell Phones were
seized from the Equinox.  The evidence of the location of the Cell Phones when
seized is consistent that they were on Defendants' persons.

SA Yates testified they had a factual basis to believe and understood that Defendants' Cell Phones were taken from their persons.

TFO Hoopingarner testified that, when Alvarez was interviewed, they found cell phones on his person, and that he "knew, having been there, that [Alvarez] had phones on him" but TFO Hoopingarner did "not know who took them off of him." (Tr. at 117).  TFO Bailey testified that he "d[id]n't recall anybody going anyplace to get" Alvarez's Cell Phones, and "[w]hen [Alvarez] identified them, they were in his hands, and/or with [Lt.] Arroyo."  (Tr. at 237, 276-77).  SA Yates testified that it was his "understanding" that Alvarez's Cell Phones were "taken off of Mr. Alvarez's persons [sic]," that nothing belonging to Alvarez was seized from the Equinox, and that he "know[s] of nothing that came out of the Equinox."  (Tr. at 64:19-65:1).

After Cervantes was apprehended, TFO Bailey escorted Cervantes inside One Stop and had him sit in a chair "near the back of the shop where there was one bay door that goes from the inside to the back."  (Tr. at 229).  Cervantes was interviewed approximately an hour later, in a nearby area of the shop.  (Id.).  TFO Bailey testified that, when he asked Cervantes if he had a cell phone, Cervantes indicated that he did, and "gestured in the direction with his face towards the area where he was seated prior to the interview."  (Tr. at 234-35).

41

Lt. Arroyo "walked over with him and retrieved the cell phone," but TFO Bailey could not recall from where they retrieved it.[40] (Id.). TFO Hoopingarner testified that, at the time Cervantes was asked to call Guerrero, Cervantes's Blackberry was "behind the toolbox," and when asked if he knew how it got on a toolbox, TFO Hoopingarner replied that "[o]ne of the agents that removed it when they did the pat down placed it on the [tool]box." (Tr. at 117-18).

SA Kautz testified that, although all of the individuals detained at One Stop were initially patted down for weapons, if law enforcement officers "couldn't feel it to be a threat, they just left [the item] where it was." (Tr. at 302). This testimony supports that, after his arrest, Alvarez remained in possession of his Cell Phones, which were seized from his person later during his interview. This also supports that Cervantes's Cell Phone remained with him during the time he was seated inside the shop, after his arrest but before his interview.[41]

Reasonable inferences further support that Defendants' Cell Phones were in their possession at the time of their arrests. Delivery Officers observed Defendants

---

[40]   Although Lt. Arroyo testified at the evidentiary hearing, he did not discuss, and was not asked about, Defendants' Cell Phones.

[41]   That Cervantes's cell phone was not on him when he was interviewed, but instead was retrieved from the area of the shop where he had been seated after he was arrested, is not material. Cervantes does not challenge his arrest and the Court finds there was probable cause to arrest Cervantes, including because TFO Bailey recognized Cervantes as the driver of the Equinox.

using cell phones while conducting the "heat check," and Cervantes used a cell phone to communicate throughout the day with Guerrero and, it appears, Carlos in Mexico, to coordinate delivery of the Scottsdale Truck. (Tr. at 11-12, 14, 45, 52-53, 58, 205-10). It is unlikely that Defendants, when they arrived at One Stop, left their cell phones in the Equinox foreclosing communication with others involved in the delivery of the methamphetamine.

After *de novo* review, the Court finds that the record establishes by a preponderance of the evidence that Defendants' Cell Phones were seized from Defendants incident to their arrests. Defendants' objections based on the seizure of the Cell Phones are overruled.

### D.   Evidence Obtained from Alvarez's BlackBerry

Alvarez next argues that any evidence discovered during the search of his BlackBerry pursuant to the search warrant issued on July 29, 2014, must be suppressed because: (1) any evidence was the fruit of the initial illegal warrantless search of his BlackBerry; (2) SA Small's Affidavit supporting the warrant application contained materially false information, requiring a Franks hearing; and (3) the search of Alvarez's Blackberry exceeded the scope of the search authorized by the warrant.

1.     The initial warrantless search

Alvarez relies on Riley v. California, --U.S.--, 134 S. Ct. 2473 (2014), to support that SA Yates's removal of the battery from his BlackBerry prior to obtaining a search warrant constitutes a more than minimally intrusive search incident to his arrest.  Alvarez's reliance on Riley is misplaced.  In Riley, the Supreme Court held that "a warrant is generally required before a . . . search [of a cell phone], even when a cell phone is seized incident to arrest."  Id. at 2493. Focusing on the extensive amount of data and personal information stored on cell phones, the Supreme Court expressly declined to extend Robinson, which held that the search incident to arrest doctrine applies to a search of the arrestee's person and any items found on his person, "to searches of *data* on cell phones" seized during a search incident to arrest.  Riley, 134 S. Ct. at 2483-85 (emphasis added); see also United States v. Dixon, 984 F. Supp. 2d 1347, 1353 (N.D. Ga. 2013) (holding defendant's Fourth Amendment rights were violated when, prior to obtaining a warrant, agent "searched, downloaded, and extracted all the data he could from [the cell phone] and its storage media;" finding privacy interests in cell phones, which "are in effect mini-computers" and contain "a wealth of private information," support requiring a warrant to search for that information).

Here, SA Yates did not retrieve any data from Alvarez's BlackBerry before

obtaining a warrant.  SA Yates simply removed the battery to view identifying

information printed by the manufacturer or seller behind the battery to obtain the

search warrants.  (Tr. at 26-28, 65-68; Small Aff. ¶ 23 & n.1)  The Court finds that

this minimally intrusive examination does not implicate the privacy interests at

issue in Riley and was reasonable under the circumstances here.  Riley simply does

not apply.  See Riley, 134 S. Ct. at 2485; Dixon, 984 F. Supp. 2d 1347; see also

United States v. Pacheo, No. 11-cr-121-A, 2015 WL 3402832, at *6 (W.D.N.Y.

May 27, 2015) (applying Riley and finding that officers "can legally enter the

phone without a search warrant and remove the battery so as to view hard copy

phone identification numbers which do not constitute 'digital data' contained

within the phone"); United States v. Lowe, No. 2:14-cr-00004-JAD-VCF,

2014 WL 5106053, at *3 (D. Nev. Oct. 10, 2014) (recognizing that physical

features of cell phone—such as battery and serial number—do not contain

"sensitive personal information" requiring a search warrant under Riley; finding "it

was reasonable for the government to remove that back cover of [the] cell phone

without a warrant . . . [because] it is part of the 'physical aspects of a phone' that

officers are still permitted to inspect without fear of triggering greater privacy

interests.").

The Court finds that SA Yates's removal of the battery from Alvarez's BlackBerry did not violate Alvarez's Fourth Amendment rights.  Even if it did, evidence obtained from the later search of Alvarez's BlackBerry pursuant to the search warrant is not required to be suppressed because the search warrant was issued based on information obtained from an independent source—the May 28 and 29, 2014, investigation and controlled delivery.  Other than advising the issuing magistrate judge that it had occurred, no information from SA Yates's examination of Alvarez's BlackBerry was included in the Affidavit in support of the search warrant application.  The information upon which SA Small relied in his Affidavit was obtained from the May 28 and 28, 2014, investigation and controlled delivery—which occurred before SA Yates examined Alvarez's BlackBerry—and thus the search warrant was issued based on information from an independent source.  See, e.g., Segura v. United States, 468 U.S. 796 (1984) (finding evidence admissible because search warrant was issued based solely on information known before unlawful entry, and because evidence that was obtained pursuant to warrant had not been seen by officers during the previous unlawful entry); United States v. Glinton, 154 F.3d 1245, 1254-55 (11th Cir. 1998) ("[I]f the search warrant was obtained based upon information from an independent source, then the warrantless entry, even though illegal, would not require exclusion of evidence.").

After *de novo* review, the Court concludes that evidence obtained from the search of Alvarez's BlackBerry pursuant to the search warrant is not required to be suppressed. Alvarez's objection based on the removal of the battery to obtain identifying information from his BlackBerry is overruled.

> 2. <u>Franks Hearing</u>

Alvarez argues that SA Small made a false statement in his Affidavit in support of the search warrant, specifically in Paragraph 23, which states:

> Agents arrested both CERVANTES and ALVAREZ. Upon searching CERVANTES, agents found a black/silver Blackberry Curve 9310. Upon searching ALVAREZ, agents found a black/silver Blackberry Curve 9310 and a white and black BLU model Studio 5.5S. These were the phones used to communicate with the driver and likely used to communicate with others in Mexico regarding the terms of the deal.

(Small Aff. ¶ 23). Alvarez claims that the last sentence misrepresents that Alvarez's Cell Phones were likely used to communicate with Guerrero and others, and he objects to the Magistrate Judge's conclusion that probable cause existed to issue the warrant even without the challenged statement.

A presumption of validity attaches to an affidavit supporting a search warrant application. <u>Franks</u>, 438 U.S. at 171. To be entitled to a <u>Franks</u> hearing, a defendant must make a "substantial preliminary showing" that the affidavit contained knowingly false statements, or false statements made with reckless disregard for the truth, or information omitted with intentional or reckless

47

disregard for the accuracy of the affidavit.  Id. at 155-56.  "Looking only at the remaining portions of the affidavit, the court will then determine whether including the omitted facts would have prevented a finding of probable cause."  United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009).  "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."  Franks, 438 U.S. at 171.

Alvarez claims that SA Small intentionally misrepresented that Alvarez's BlackBerry was likely used to communicate with Guerrero and others, including because the evidence shows that Guerrero only communicated with Flaco, who was later identified as Cervantes.[42]  The Court disagrees.  Alvarez was with Cervantes during the May 29, 2014, controlled delivery, and that Cervantes was the individual communicating with Guerrero does not mean that Cervantes did not use Alvarez's BlackBerry to communicate with Guerrero or others.  SA Small

---

[42]    Alvarez fails to support his conclusorily assertion that, at a hearing, he could produce evidence that his BlackBerry was not used to communicate with Guerrero or the other individuals in Mexico.  See Franks, 438 U.S. at 171 ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory . . . . There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.").  Even if true, without more, Alvarez's assertion that his BlackBerry was not used to communicate with Guerrero is not sufficient to support that SA Small knew that fact at the time he prepared his Affidavit.

stated that two cell phones were seized from Alvarez and one from Cervantes. He did not mislead the issuing magistrate judge about Flaco or who was involved in the communications described.

It is clear that at least one of the cell phones seized was used during the controlled delivery. There is no evidence to support that SA Small's alleged "misstatement" that "these were the phones used to communicate with Guerrero" was made knowingly, or with reckless disregard for the truth. See United States v. Harris, 172 F. App'x 950, 958-59 (11th Cir. 2006) ("The fact that the officers' definition . . . is perhaps not as stringent as the one [defendant] might hope for does not mean that the officers were deliberately lying."). Coupled with SA Small's statements that, based on his training and experience, "[i]t is common for drug traffickers to utilize multiple phones"—for example, using separate cell phones to contact individuals performing different roles within their organization—to keep law enforcement officers from understanding the full scope of their. . . illegal conduct," it was "likely" that these phones were "used to communicate with others in Mexico regarding the terms of the deal." (Small Aff. ¶¶ 8-11, 23).

Even without the allegedly false statement, the Affidavit contains sufficient information to connect Alvarez to the drug trafficking described and to establish

probable cause to search Alvarez's BlackBerry.  The Affidavit states that "Alvarez paid [Guerrero] $1,000 . . . the amount that Carlos had promised [Guerrero]" for delivery of the Scottsdale Truck.  (Small Aff. ¶ 20).  This supports his active involvement in the conspiracy, for which he had been indicted before the warrant was sought.  (Id. ¶ 24).  The issuing magistrate judge also properly relied on SA Small's opinion, based on his training and experience regarding the way drug traffickers use cell phones to facilitate their illegal activities, to find a nexus between Defendants' Cell Phones, including Alvarez's BlackBerry, and evidence of the drug conspiracy.  See United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (opinions and conclusions of experienced agents about facts are properly considered in determining probable cause); United States v. Henry, No. 1:09-cr-0522-1, 2010 WL 5559207 at *10 (N.D. Ga. Dec. 7, 2010) (finding that the affidavit that set forth the background information of a drug conspiracy provided probable cause for the "search of the computer and cell phone"); United States v. Aguirre, 664 F.3d 606, 615 (5th Cir. 2011); United States v. Kilgore, No. 1:11-cr-00518, 2012 WL 5334298, at *8-9 (N.D. Ga. Sept. 13, 2012); see also Riley, 134 S. Ct. at 2493 (recognizing that "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal

enterprises, and can provide valuable incriminating information about dangerous criminals").

After *de novo* review, the Court finds that there was not any misleading or false statement in the Affidavit supporting the search warrant, and even if there was an allegedly false statement, probable cause existed to support issuance of the search warrant for Alvarez's BlackBerry.  The Court concludes that a <u>Franks</u> hearing is not required and Alvarez's objection to the issuance of the warrant to search his BlackBerry is overruled.

> 3. <u>Whether the search exceeded the scope authorized by the search warrant</u>

Alvarez argues that the search of his BlackBerry exceeded the scope of the search authorized by the search warrant because "[t]hrough the search of his BlackBerry . . . law enforcement agents seized call logs, contact lists, records of messages and some image files . . . [and] copied and saved all of the contents of [his] two smart phones."  (<u>See</u> [63] at 18).  Alvarez claims that the warrant "did not allow a total imaging or copying of all the data in Mr. Alvarez's phone, as occurred" and he objects to the Magistrate Judge's finding that he failed to show that the Government showed flagrant disregard for the terms of the warrant.

The Fourth Amendment requires that search warrants "particularly describe the place to be searched and the terms or person to be seized . . ." and "[o]nly items

described in the search warrant may be seized."  United States v. Jenkins, 901 F.2d 1075, 1081 (11th Cir. 1990) (citing United States v. Johnson, 713 F.2d 654, 660 (11th Cir. 1983), cert. denied 465 U.S. 1030 (1984).  "If a search exceeds the scope of terms of a warrant, any subsequent seizure is unconstitutional" but "may be extensive as reasonably necessary required to locate the items described in the warrant."  United States v. Jackson, 120 F.3d 1226, 1228 (11th Cir. 1997) (citation omitted).  "The critical inquiry is always whether the search and seizures were reasonable under all the circumstances."  United States v. Schandl, 947 F.2d 462, 465 (11th Cir. 1991) (citation and quotation omitted).  Seizure of items beyond the scope of the warrant does not automatically invalidate the search.  See United States v. Khanani, 502 F.3d 1282 (11th Cir. 2007).  "Total suppression may be appropriate where the executing officer's conduct exceeds any reasonable interpretation of the warrant's provisions."  United States v. Wuagneux, 683 F.2d 1343, 1354 (11th Cir. 1982) (citations omitted).  It is well-settled that "absent a flagrant disregard of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of the items properly seized."  Id. (quotation and omitted).

Here, the search warrant authorized the search of Alvarez's BlackBerry for:

a.  lists of customers and related identifying information;

      b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      d.  any information recording schedule or travel;

      e.  all bank records, checks, credit card bills, account information, and other financial records[; and]

      f.  any and all communications with co-conspirators, including but not limited to voice calls, text messages, and pin-to-pin messages[.]

(See [57.1] at 3).  The search warrant noted that "the terms 'records' and 'information' include all of the foregoing items of evidence in whatever form and by whatever means that may have been created or stored, including any form of computer or electronic storage . . . ."  (Id.).  The search warrant specifically authorized the Government to seize call logs, contact lists, text messages, and any evidence "in whatever form and by whatever means . . . including any form of computer or electronic storage . . . ."  (Id.).

      There simply is no evidence to support Alvarez's conclusory contention that the Government "copied and saved all the contents" from his BlackBerry.  Alvarez does not present any evidence or argument, including in his post-hearing brief or objections, in support of this claim.  He failed to provide an inventory of the items seized, and the only items he identifies as being seized appear to fall within the

scope of the search authorized by the warrant.  Because Alvarez fails to identify the items he claims were wrongfully seized, Alvarez fails to satisfy his burden to show that the search of his BlackBerry amounted to a "flagrant disregard" of the warrant's terms.  See United States v. Libson, 835 F. Supp.2d 1329, 1347 (N.D. Ga. 2011); United States v. Arzate, 2014 WL 1256075, at *9 n.2 (N.D. Ga. Mar. 26, 2014) (citing United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000)) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detained, and non-conjectural to enable the court to conclude that a substantial claim is presented . . . .  The Court need not act upon general or conclusory assertions.").

After de novo review, the Court finds that there is no evidence to support that the search of Alvarez's BlackBerry exceeded the scope of the search authorized by the warrant.  Evidence obtained from the search of Alvarez's BlackBerry conducted pursuant to the search warrant is not required to be suppressed.  Alvarez's objection based on seizure beyond the scope of the warrant is overruled.

**V.     CONCLUSION**

Accordingly, and for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Objections [98, 99] are

**OVERRULED**.

**IT IS FURTHER ORDERED** that Magistrate Judge Janet F. King's Report

and Recommendation [93] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Defendants' Motions to Suppress

Evidence [35, 37, 57, 60] are **DENIED.**

**IT IS FURTHER ORDERED** that Cervantes's Motion to Suppress

Statements [36] is **DENIED**.

**IT IS FURTHER ORDERED** that Alvarez's Motion to Suppress

Statements [55] is **DENIED AS MOOT**.


**SO ORDERED** this 13th day of August, 2015.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE